AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**6/2/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**6/2/2025**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY

United States of America,

v.

JEREMY SALLY,

Defendant.

Case No.    2:25-MJ-03351-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 17, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/*
*Complainant's signature*

Cinthia Gutierrez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        6/2/2025
_____

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate Judge
*Printed name and title*

AUSA: Joshua J. Lee x3183

## AFFIDAVIT

I, Cinthia Gutierrez, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Jeremy SALLY ("SALLY") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) (possession with intent to distribute a controlled substance).

2.    This affidavit is also made in support of applications for warrants to search:

a.    1368 East 9th Street, Upland, California 91786, a single-family home and residence of SALLY and Zaidet LOPEZ ("LOPEZ"), as further described in Attachment A-1 ("**SUBJECT PREMISES 1**");

b.    135 South Campus Avenue, Upland, California 91786, Space Number 0838, an Extra Space Storage multi-unit business location, which is being leased by Zaidet LOPEZ, as further described in Attachment A-2 ("**SUBJECT PREMISES 2**");

c.    1210 County Road Pomona, California 91766, Unit D022, a US Storage Centers multi-unit business location, which is being leased by SALLY, as further described in Attachment A-3. ("**SUBJECT PREMISES 3**") (collectively, the "**SUBJECT PREMISES**").

3.    The requested search warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of or possession with

1

intent to distribute a controlled substance) and 846 (conspiracy to distribute or possess with intent to distribute a controlled substance) (the "Subject Offenses").

4.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

II.  **BACKGROUND OF SPECIAL AGENT CINTHIA GUTIERREZ**

5.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since October 2019.  As an FBI SA, I have received training on a multitude of federal offenses at the FBI Academy in Quantico, Virginia and other law enforcement trainings.  I received a Bachelor of Science dual degree in Business Economics and Information Systems with a minor in Philosophy from the New York University Stern School of Business.  As an FBI SA, my duties include the investigation of federal criminal violations.  I am currently assigned to the Los Angeles Division, West Covina Resident Agency, of the FBI.  During my employment with the FBI, I have

participated in investigations involving individuals illegally possessing narcotics and/or firearms, the illegal distribution of narcotics, money laundering and structuring, and violations of computer and high-technology crimes, including computer intrusions and other malicious computer activity.

6.    Since 2024, I have been assigned to the San Gabriel Valley Safe Streets Gang Task Force ("SSTF").  The SSTF is currently comprised of law enforcement personnel from the FBI, the Pomona Police Department, the Drug Enforcement Administration ("DEA"), the Los Angeles County Sheriff's Department, and the El Monte Police Department.  The primary mission of the SSTF is to investigate violations of federal law by gang members and narcotics dealers.  The SSTF also investigates violent serial offenders, violent fugitives, illegal weapons, and the illegal distribution, manufacturing, trafficking, possession, and sales of controlled substances. Part of its mission is to assist other federal, state, or local law enforcement agencies within the San Gabriel Valley with investigations of gang members, narcotics trafficking, violent crime, or violations of federal law.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

7.    In March 2025, the FBI initiated an investigation into SALLY following a Pomona Police Department ("PPD") incident and arrest of SALLY.  As part of the investigation, I reviewed PPD reports, PPD body-worn camera footage of the incident from multiple officers, security footage of the incident location,

and spoke to other law enforcement officers familiar with the initial reports.  Below is a summary of my review.

### A.    The Anonymous Call

8.    On March 17, 2025, at approximately 7:23 p.m., PPD officers were dispatched to a 7-Eleven store located at 808 Indian Hill Boulevard in Pomona, California, in reference to a call for service about a suspicious subject possibly selling narcotics out of a black Ford Taurus, with tinted windows, and California license plate number 9KNT827.

### B.    Officers Arrived and Found SALLY

9.    When the officers arrived at the 7-Eleven, they saw a car matching the description provided in the call for service. Specifically, Officer Kevin Ferlin saw occupants of the car loitering, in violation of Pomona City Code Section 34-155(b), and confirmed that the car had tinted windows, in violation of Section 26708 of the California Vehicle Code.  Due to multiple visible violations, as well as to investigate possible narcotics sales as the anonymous caller described, officers conducted a traffic stop of the car, which had its engine on.  SALLY was in the driver's seat, and he was with a female passenger.  The female passenger said she met SALLY at a nearby store and was cold, so SALLY offered to let her warmup in his car.

10.    Officers asked SALLY to exit the car.  SALLY was holding two cellphones in his hand as he exited the car.[1]  SALLY

---

[1] On March 21, 2025, the Honorable Michael B. Kaufman authorized two search warrants for the two phones: 25-MJ-01685 for a gray REVVL 6 Pro cellular phone and 25-MJ-01694 for a silver iPhone

had an expired driver's license, which had expired about a week prior.  SALLY told the officers that he had met the female at a store about 30 minutes prior and because she looked cold, he let her warmup in his car.  SALLY said that he lived in Rancho Cucamonga, that he did not have a job, and that he did not use drugs.  According to Officer Ferlin, SALLY did not appear to be under the influence of any drugs or alcohol at this time.

**C.   Officers Found Narcotics in a Hidden Compartment**

11.  Officers conducted a pat down/cursory search of SALLY's person for contraband with negative results.  When officers asked SALLY what he had in his pocket, he said "just money sir."  Officers asked SALLY if he could empty his pocket, and he did.  SALLY had about $4,649 in cash in his pocket.

12.  Officers asked SALLY about his car.  SALLY said that the car was not registered to him, but he had owned the car for about six months.  Officer Ferlin asked for consent to search SALLY's car, to which SALLY agreed.  Officer Ferlin then reiterated his question, stating "I just want to verify, you give me consent to search your car?"  SALLY answered, "Yes, you can search my car."

13.  During the search of SALLY's car, officers looked inside and saw that the dashboard on the passenger side appeared to have been altered.  When Officer Ferlin opened the glove compartment, he noticed it was loose on both sides as if it had

---

with a blue case, each seized from SALLY's person on March 17, 2025.

been previously removed.  He slightly pulled on the glove
compartment, and it disconnected completely, exposing a hidden
compartment that led to the passenger side airbag compartment
(in the dashboard area).  Officer Ferlin pulled on the airbag
cover and the compartment easily opened, revealing several large
sandwich bags containing several individually wrapped packages
of suspected narcotics.



     14.  Prior to touching or moving any of the packages,
officers requested a K-9.  The K-9 officer responded in
approximately 10 minutes.  The K-9 sniffed the car and alerted
to the passenger side of the car, indicating the presence of
narcotics.

**D.    Officers Found Additional Narcotics in SALLY's Underwear**

15.    Officers arrested SALLY for narcotics sales and told SALLY he was going to be taken to the Pomona City Jail.  They advised SALLY that taking any additional drugs or weapons hidden on his person into the jail would result in additional charges. At that point, SALLY stated that he had more narcotics hidden in his underwear.  Once at the Pomona city jail, officers conducted a strip search of SALLY.  During the strip search, officers found another large sandwich sized bag containing many individually wrapped packages of suspected narcotics in his underwear in the crotch area.

16.    SALLY was provided with a <u>Miranda</u> admonishment but declined to speak with officers.

**E.    DEA Laboratory Results**

17.    The FBI sent the suspected narcotics, labeled as exhibits 1B51 through 1B70, to the DEA Southwest Laboratory for chemical testing.  The substances identified included heroin, cocaine, methamphetamine, fentanyl, and a mixture of additional substances, with a combined total net weight of approximately 1476.59 grams.

**F.    Search Warrant for the Ford Taurus CA 9KNT827**

18.    Pursuant to SALLY's arrest, the 2012 black Ford Taurus, bearing California license plate 9KNT827, was towed to the commercial business of Sanders Towing, located at 415 East Commercial Street, Pomona, California.  A search of a database maintained by the California Department of Motor Vehicles

("DMV") revealed that the car was registered to LOPEZ, with an address of 10292 Central Avenue, Apartment 296, Montclair, California, which was determined to be a P.O. Box address.

19.  On March 20, 2025, members of the SSTF, including myself, served a California state search warrant on the car.[2] Inside the vehicle was the current registration card, which confirmed the car was registered to LOPEZ, with an address of 10292 Central Avenue, Apartment 296, Montclair, California. Also inside the vehicle was an insurance policy with an effective date of February 19, 2025.  The name and address of the insured was listed as LOPEZ, 1368 East 9th Street, Upland, California, that is **SUBJECT PREMISES 1**.  The listed drivers were LOPEZ and SALLY.  Based on this information, it appears that LOPEZ and SALLY are currently residing at **SUBJECT PREMISES 1**, which was further corroborated by subsequent surveillance as later described.

### G.    Security Footage from the 7-Eleven[3]

20.  Following SALLY's arrest outside of the 7-Eleven located at 806 Indian Hill Boulevard, Pomona, California, PPD officers noticed a security camera outside the store, which was pointed directly where SALLY's car had been parked.  Officers

---

[2] The California state search warrant was issued by the Honorable Rubiya Nur, Superior Court for the County of Los Angeles, on March 20, 2025.
[3] The stated timestamps are approximate and are based off of the timestamps from the security footage video, which appeared to have discrepancy, by a few minutes, from body worn camera worn by PPD Officers.

obtained security footage from the 7-Eleven to further corroborate the reported narcotics-related activity that was occurring prior to the arrival of the officers. Members of the SSTF, including myself, have reviewed the security footage. The reviewed security footage showed SALLY arriving in his car to the 7-Eleven parking lot at approximately 6:33 p.m. on March 17, 2025.

a.    At approximately 6:34 p.m., a white sedan parked next to SALLY's vehicle and an unidentified male ("UM1") exited his own vehicle and entered SALLY's front passenger seat. SALLY and UM1 appeared to conduct a hand-to-hand exchange inside of SALLY's vehicle. At approximately 6:35 p.m., UM1 exited SALLY's vehicle, entered his own vehicle and drove away.

b.    At approximately 6:36 p.m., an unidentified female ("UF1") walked to the front passenger side of SALLY's vehicle and entered the vehicle. SALLY and UF1 appeared to conduct a hand-to-hand exchange inside of SALLY's vehicle. At approximately 6:44 p.m., UF1 exited SALLY's vehicle and walked away.

c.    At approximately 6:44 p.m., a second unidentified male ("UM2") walked to the front passenger side of SALLY's vehicle and entered the vehicle. SALLY and UM2 appeared to conduct a hand-to-hand exchange inside of SALLY's vehicle. At approximately 6:56 p.m., UM2 exited SALLY's vehicle and walked away.

d.    At approximately 6:56 p.m., a third unidentified male ("UM3") walked to the front passenger side of SALLY's vehicle and entered the vehicle.  SALLY and UM3 appeared to conduct a hand-to-hand exchange inside of SALLY's vehicle.  At approximately 7:00 p.m., UM3 exited SALLY's vehicle and walked away.

e.    At approximately 7:06 p.m., a second unidentified female ("UF2") walked to the front passenger side of SALLY's vehicle and entered the vehicle.  SALLY and UF2 appeared to conduct a hand-to-hand exchange inside of SALLY's vehicle.  At approximately 7:11 p.m., UF2 exited SALLY's vehicle and walked away.

f.    At approximately 7:15 p.m., a female later identified as Ann Carlson ("CARLSON") arrived in a white colored sedan and parked two stalls away from SALLY's vehicle.  This is the female that the PPD contacted with SALLY.  At approximately 7:17 p.m., CARLSON exited her car and entered the front passenger seat of SALLY's car.  CARLSON gave SALLY cash and conducted two hand-to-hand exchanges.  At approximately 7:20 p.m., PPD officers arrived and contacted SALLY and CARLSON who was still inside of SALLY's car.

g.    Based on my training, experience, knowledge of this investigation, and from speaking with other senior investigators assigned to the SSTF, I believe the hand-to-hand exchanges observed over the security footage were consistent with drug sales.

**H.    Recorded Jail Calls Between SALLY and LOPEZ**

21.   On the day of his arrest on March 17, 2025, as well as March 18, 2025, SALLY made several phone calls from the Pomona City Jail and Los Angeles County Jail.  These calls were recorded.  Below I have included summaries of the calls made by SALLY.  They are not meant to be taken as verbatim transcriptions and are not meant to encompass every detail of the phone call.  In some instances, I have included my interpretation of what was being said, based on my training, experience, and knowledge of this investigation, in parenthesis.

22.   On March 17, 2025, beginning at approximately 10:19 p.m., SALLY made an outbound call to 626-413-8345 from the Pomona City Jail.  Per commercial database searches, the number was a wireless phone registered to LOPEZ.  During the call, SALLY asked LOPEZ, "*Did you clean up [in coded language, SALLY was asking if LOPEZ removed the contraband from their residence]?*"  LOPEZ repeated the question to SALLY, "*Did I clean up [LOPEZ appeared to not understand the coded language]?*"  SALLY responded, "*Yeah, you know what I'm talking about?*"  LOPEZ replied, "*Yeah, yeah.*"  Later, LOPEZ asked SALLY, "*So for sure you want me to clean up right?*"  SALLY confirmed in the affirmative.

23.   On March 17, 2025, beginning at approximately 11:11 p.m., SALLY made an outbound call to 626-413-8345 from the Pomona City Jail.  LOPEZ answered the call.  During the call, SALLY acknowledged that he saw LOPEZ arrive when he was being

arrested, but he wanted her to go to the "*pad and take care of business*" and did not want the police to question LOPEZ.  Later SALLY said he "*had money up under [his] pillow, it was a bag with the money from yesterday*" and asked if LOPEZ had found it. LOPEZ told SALLY that she was going to try to get into the room, and "*bust the door open*."  SALLY said, "*[O]kay, please do that.*" LOPEZ said, "*Yeah, I have to, I am about to do it right now.*" Later in the call SALLY told LOPEZ, "*[M]ake sure you clean the house tomorrow, take care of business baby, please.*"  LOPEZ responded, "*Yes, for sure, I am doing that right now [LOPEZ stating, in coded language, that she was removing the contraband].*"  While hammering is heard in the background, LOPEZ told SALLY, "*Alright, I opened the door*" and "*Yeah, I'm in.*" LOPEZ told SALLY she was going to get up early in the morning and take everything to a specific place (likely referring to a storage facility, presumably **SUBJECT PREMISES 2** or **SUBJECT PREMISES 3**), wait for them to open, and return the stuff.

24.  On March 18, 2025, beginning at approximately 3:47 p.m., SALLY utilized another inmate's PIN to place an outbound call to 626-413-8345.  LOPEZ answered the call.  During the phone call, SALLY said to LOPEZ that he had "*$100,000 in the room [presumably drug proceeds]*" and asked if LOPEZ had a safe key and that he thought there was $95,000 in the safe.  LOPEZ confirmed she had access and that she "*put it all in one place...just in case.*"  During the call, LOPEZ further stated, "*they open the place over there at six in the morning [I*

*confirmed that the storage facility opened at 6:00 a.m.]*" "*so I didn't sleep, I cleaned all day and at six in the morning I left [likely to move contraband from **SUBJECT PREMISES 1** to the storage facility, presumably **SUBJECT PREMISES 2** or **SUBJECT PREMISES 3***].*"

      **I.  Storage Facilities rented by LOPEZ and SALLY**

     25.  Following the information discussed between SALLY and LOPEZ in the aforementioned jail calls, it appeared that LOPEZ had gained access to a locked room inside **SUBJECT PREMISES 1**, "cleaned" the room of contraband items, and moved contraband items, including cash and possibly drugs, into a nearby storage location, which opened at 6:00 a.m.  Using this information, members of the SSTF identified several storage locations in the vicinity of **SUBJECT PREMISES 1** that opened at 6:00 a.m.  I subsequently served administrative subpoenas to the identified storage facilities to determine if there were any current rental agreements for LOPEZ and/or SALLY at those locations.

     26.  On April 28, 2025, a representative for Extra Space Storage, a storage rental facility located at 135 South Campus Avenue, Upland, California 91786, confirmed there was an active rental agreement for unit 0838 (**SUBJECT PREMISES 2**), a 5x6 unit, in the name of "Zaidet LOPEZ."  The agreement included the information consistent with LOPEZ's personal identifying information, including date of birth, address, cellphone number, and driver's license number.  As of May 23, 2025, the rental agreement for **SUBJECT PREMISES 2** was last paid for in cash on

May 19, 2025, and paid through June 21, 2025.  The unit was
accessed using an access code on April 7, 2025, April 12, 2025,
and April 21, 2025.  This business opened at 6:00 a.m.

      a.   On April 29, 2025, a representative for US
Storage Centers, a storage rental facility located at 1210
County Road Pomona, California 91766 confirmed there was an
active rental agreement for unit D022 (**SUBJECT PREMISES 3)** in
the name of "Jeremy SALLY."  The address provided by SALLY as
his residence was 1245 Morning Sun Drive, Pomona, California
91767.  Since July 2024, the unit had been accessed four times,
beginning on January 6, 2025, and last accessed on April 7,
2025.  Additionally, management was aware that a female
typically parked off premises, walked into the rental office,
and paid for the unit in cash.  This business opens at 9:00 a.m.

      **J.**    **Search Warrant for SALLY's Phones**

   27.   Pursuant to SALLY's arrest, two cellphones found in
his possession were seized and booked into evidence by the PPD.
On March 21, 2025, U.S. Magistrate Judge Michael B. Kaufman
authorized the search of the seized phones to include a gray
REVVL 6 Pro cellular phone with IMEI # 869589061841054 under
case 25-MJ-01685 and a silver iPhone with a blue case under case
25-MJ-01694.  Both phones were forensically downloaded and
reviewed by members of the SSTF, including myself.

   28.   A review of the REVVL 6 Pro revealed SALLY utilized
the phone to communicate with what appeared to be customers who
would purchase narcotics from SALLY at various locations in

Pomona, California.  On March 17, 2025, the day of SALLY's arrest, there were approximately 339 text messages exchanged with numerous people, including people asking variations of where SALLY was, that he was at a nearby 7-Eleven, as well as short phone calls between SALLY and other individuals.  Based on my training, experience, knowledge of this investigation, and from speaking with other senior investigators assigned to the SSTF, I believe these types of text exchanges and short phone calls are consistent with drug sales.

29.  The cellphone included photographs with metadata as recent as March 10, 2025, depicting SALLY inside a residence in the vicinity of **SUBJECT PREMISES 1.**

a.  Location data on the cellphone included **SUBJECT PREMISES 1** saved as a destination address in a GPS mapping program.

b.  In a text message conversation between SALLY and LOPEZ on November 20, 2024, LOPEZ shared a photo of the inside of a storage unit and a video of the same storage unit as depicted below.



c.    The photo and video of the storage unit was
followed by a text message from LOPEZ stating, "*5x6 $57 a month
Plus whatever insurance But I'll explain more when I call you.*"
SALLY replied. "*Perfect.*"  The photo and video on SALLY's phone
also included metadata location, which corresponded to **SUBJECT
PREMISES 2**, an Extra Space Storage facility for which LOPEZ
signed a lease agreement for a 5x6 unit on November 21, 2024.

30.  Additionally, both the iPhone and REVVL 6 contained
photographs/videos of what appeared to be large amounts of
controlled substances, in what appeared to be a residential
setting, presumably **SUBJECT PREMISES 1**.  In one video, SALLY
could be heard narrating as he manipulated what appeared to be a
controlled substance while complaining about the quality.  Each
cellular phone also contained photographs of firearms, also in a
residential setting, presumably **SUBJECT PREMISES 1**.  From
reviewing SALLY's criminal history, I know that he has several

16

felony convictions and is prohibited from owning or possessing firearms and/or ammunition.

**K.    Surveillance in the vicinity of SUBJECT PREMISES 1**

31.    Between March 21, 2025, and May 28, 2025, law enforcement conducted surveillance on **SUBJECT PREMISES 1**.  The following observations were made:

a.    On March 21, 2025, SSTF Task Force Officer ("TFO") Alejandro LOPEZ drove by **SUBJECT PREMISES 1** and spotted three cars parked inside the property: a red Escalade (California license plate no. 9DHG653) registered to SALLY, a silver Mercedes (California license plate no. 9PER758) registered to LOPEZ, and a blue Kia (California license plate no. 8NNJ467) registered to LOPEZ at **SUBJECT PREMISES 1**.

b.    On April 14, 2025, law enforcement conducted surveillance of **SUBJECT PREMISES 1**.  A silver Mercedes (California license plate no. 9PER758) registered to LOPEZ was parked inside the gated area of the property.  LOPEZ then exited the front door of **SUBJECT PREMISES 1** and walked towards a white Jaguar SUV (California license plate no. DD37X21), which was also registered to LOPEZ.

c.    On April 17, 2025, law enforcement conducted surveillance of **SUBJECT PREMISES 1**.  LOPEZ was observed opening the front door, letting a dog out, and closing the door. Approximately 35 minutes later, LOPEZ opened the front door and let a dog back inside the residence.

d.    On April 22, 2025, law enforcement conducted surveillance of **SUBJECT PREMISES 1**.  LOPEZ was observed opening the front door, letting a dog out, and closing the door. Approximately 13 minutes later, LOPEZ was observed opening the door, and closing the door again, staying inside while the dog stayed outside.

e.    On May 27, 2025, law enforcement conducted surveillance of **SUBJECT PREMISES 1**.  Visible from the back alleyway, the rear three-car garage was half open and a blue vehicle, consistent with a blue Corvette (California license plate no. 9KCY185), which was registered to LOPEZ, was seen inside the garage.  Later, LOPEZ was seen exiting from the front door and leaving in the silver Mercedes (California license plate no. 9PER758), returning approximately 30 minutes later.

f.    On May 28, 2025, law enforcement conducted surveillance of **SUBJECT PREMISES 1**.  LOPEZ was seen arriving at the residence in the white Jaguar (California license plate no. 9SXK881, previously temporary plate DD37X21).  LOPEZ opened the front gate, drove in, and closed the gate behind her.  LOPEZ used a key to open the front door and walked inside, leaving the door open.  LOPEZ then exited the residence, followed by SALLY, and walked back to the white Jaguar.  SALLY followed LOPEZ to the white Jaguar and looked inside the front passenger area of the vehicle.  The surveillance vehicle drove away while observing SALLY near the front of the white Jaguar with all doors open.

18

IV.  **TRAINING AND EXPERIENCE ON DRUG OFFENSES**

32.  Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents, as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

33.  Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their

19

vehicles, in off-site storage facilities, and in other areas to which they have ready access.

34. Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution. The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances. Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

35. Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records may be maintained on paper, in the form of business and personal ledgers and diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and

20

amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

36.   Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas.  These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

37.   Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses.  These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables.  Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of

21

friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

38.  Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

39.  Drug traffickers usually sell their product for cash. Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

40.  Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign and/or domestic banking institutions and their attendant services, real estate

22

and businesses, both real and fictitious.  They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace.  This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws.  Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

41.  Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail.  These records can be maintained on paper, but also can be maintained as electronic data on

computers and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

42.  The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

43.  Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives.  Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

44.  Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits. They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

45.  I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

46.  Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing

search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

47.  Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance

system will also depict evidence of the residents' drug
trafficking activities and conversations related to drug
trafficking.

48.  Documents showing who owns, occupies, or controls the
location being searched also show who is responsible for the
items found on the premises, including contraband and other
evidence seized.  Documents and items showing the identity of
the persons owning, residing in or controlling the area being
searched include, but are not limited to, utility and telephone
bills, canceled envelopes and correspondence, outgoing answering
machine messages, tax returns, keys, deeds and mortgage
receipts.  These documents may also be produced on computers,
downloaded from online accounts or scanned into digital format
and stored on computers and related digital media.

49.  The term "computer" includes all types of electronic,
magnetic, optical, electrochemical, or other high speed data
processing devices performing logical, arithmetic, or storage
functions, including desktop computers, notebook computers,
mobile phones, smartphones, tablets, server computers, and
network hardware. The term "digital media" includes personal
digital assistants (PDAs), smartphones, tablets, BlackBerry
devices, iPhones, iPods, iPads, digital cameras, and cellular
telephones.  The term "storage media" includes any physical
object upon which electronic data can be recorded, such as hard
disks, RAM, floppy disks, flash memory, CD-ROMs, and other
magnetic or optical media or digital medium. Collectively, the

27

terms "computer," "digital media," and "storage media" are referred to as "electronic media."

### V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

50.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

51. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

   b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   52.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

   a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

30

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SALLY's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of SALLY's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VI.  <u>CONCLUSION</u>

53.  For the reasons described above, I respectfully submit that there is probable cause to believe that evidence, fruits,

instrumentalities of the Subject Offenses will be found in the

**SUBJECT PREMISES** as described in Attachments A-1, A-2, and A-3.


Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
___2___ day of JUNE 2025.

_____
HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE